FILED
United States Court of Appeals
Tenth Circuit

January 4, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

FIRMA HELGET,

        Plaintiff - Appellant,

v.

CITY OF HAYS, KANSAS; TOBY
DOUGHERTY; and DONALD
SCHEIBLER,

        Defendants - Appellees.

No. 15-3093

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:13-CV-02228-KHV-KGG)**

_____

Matthew L. Hoppock, The Hoppock Law Firm, LLC, Overland Park, Kansas, for
Appellant.

Jessica L. Skladzien (Alan L. Rupe with her on the brief), Lewis Brisbois
Bisgaard & Smith, Wichita, Kansas, for Appellees Dougherty and Scheibler, and
Amy J. Luck (Michael J. Seck with her on the brief), Fisher, Patterson, Sayler &
Smith, LLP, Overland Park, Kansas, for Appellee City of Hays, Kansas.

_____

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **BACHARACH**, Circuit
Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

Firma Helget worked for the City of Hays, Kansas, as the administrative secretary for the Hays Police Department. In 2012, the City terminated Helget, and she initiated this 42 U.S.C. § 1983 action against the City, City Manager Toby Dougherty, and Police Chief Donald Scheibler, alleging they violated her First Amendment rights. Helget claims they terminated her in retaliation for her voluntarily providing an affidavit in support of a former police officer's wrongful-termination litigation against the City.

The district court granted summary judgment in favor of the defendants on Helget's First Amendment retaliation claims, concluding the City's interest as a public employer outweighed Helget's interest in her speech regarding a former employee's litigation. The court also granted qualified immunity to Dougherty and Scheibler.

We affirm. Applying the familiar *Garcetti/Pickering*[1] test, we conclude the City's operational interests outweigh Helget's speech interest in submitting an affidavit in ongoing civil litigation. Because Helget's role required her to work closely with her superiors and maintain confidential information, her disclosure of those confidences caused her superiors to lose trust in her, directly undermining the Department's operations. We also reject Helget's attempt to collaterally attack the district court's order because the court entered summary judgment

---

[1] *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968).

before ruling on her pending motion for spoliation sanctions.  Helget forfeited this challenge because she failed to sufficiently raise the issue during summary judgment briefing.

## I.  Background

Firma Helget was the administrative secretary for the Hays Police Department, a position she occupied for ten years before her termination in 2012. She joined the City in 1989, and during her time with the Department, she worked with multiple police chiefs and assistant police chiefs.

In her capacity as administrative secretary, Helget was tasked with "facilitating the smooth operation of the Department" and "act[ing] as a general information center."  Supp. App. 141.  This required Helget to work closely with the police chief and assistant police chief and to maintain the Department's confidential records and files.  The City's personnel manual specifically informs its employees that "disclosing confidential records or information unless directed to do so by a department head or supervisor" is cause for termination.  App. 4 (Memorandum and Opinion, Mar. 19, 2015, Doc. 211) (quoting personnel manual).

One of Helget's official duties was to act as the Department's purchasing agent.  In November 2010, she prepared a list of officers who were due new ballistic vests in the upcoming year—ballistic vests have a limited life and are replaced approximately every five years.  Helget presented the list to then-

Assistant Police Chief Philip Hartsfield, who instructed her to remove Officer Blaine Dryden from the list. This was the first time Helget had been told to remove an officer from a ballistic vest ordering list. She removed Dryden's name and, on December 6, 2010, she ordered the vests as Hartsfield instructed.

One month later, on January 7, 2011, the City terminated Dryden, citing an incident that occurred in late December 2010, where Dryden was accused of unprofessional and inappropriate conduct at a court hearing. Dryden, however, maintained the City wrongfully terminated him because of his union-organizing activities, and subsequently sued the City under 42 U.S.C. § 1983. In challenging the City's reason for his termination, Dryden alleged the City had decided not to order him a new ballistic vest in early December 2010, prior to the incident the Department used to justify his termination.

During summary judgment briefing in the Dryden federal court case, Dryden's counsel contacted Helget regarding the case, and she agreed to execute an affidavit in support of the litigation. In the affidavit, Helget stated:

(1) She had been instructed to remove Dryden from the ballistic vest ordering list in early December 2010;

(2) Dryden was known to be an active member in the local Fraternal Order of Police chapter; and

(3) Former Police Chief James Braun had cautioned her about speaking with Dryden when she pursued her own grievance against the Department.

App. 40–41. Helget did not consult with anyone at the City before disclosing this information. And, her affidavit was later used as an exhibit to Dryden's opposition to the City's motion for summary judgment.

On May 1, 2012—after Helget executed the affidavit, but before City officials were aware of it—Police Chief Donald Scheibler and Assistant Police Chief Brian Dawson met with Helget to discuss her job performance. They counseled her about her excessive personal internet use during business hours and about her demeanor with her coworkers. The meeting was recorded and included in Helget's personnel file. Several days later, on May 9, 2012, Helget informed Scheibler she was considering leaving the Department; she had in fact applied for an administrative assistant position at a local university.

On May 10, Scheibler, for the first time, learned about Helget's affidavit from the City's legal counsel in the Dryden litigation. City officials sent multiple emails to one another about how to handle the situation. In particular, Human Resource Coordinator Erin Giebler and Assistant City Manager Paul Briseno exchanged emails regarding whether the City could discipline or terminate Helget for signing the affidavit. As a result of Helget's statements, Scheibler testified he no longer trusted Helget with confidential information: "I think she intentionally took that confidential information and released it . . . just deteriorating any hope for any trust between the person that she was supposed to help run the police

-5-

department." App. 9 (Memorandum and Opinion, Mar. 19, 2015, Doc. 211) (quoting deposition testimony).

Accordingly, on May 14, Scheibler presented a memorandum to City Manager Toby Dougherty recommending the City terminate Helget. The list of reasons for termination included: (1) lack of communication and interaction with command staff; (2) negative interactions with staff; (3) violations of the City's personal-internet-use policy; and (4) disclosing confidential information in the Dryden litigation. Scheibler terminated Helget two days later.

## II. Analysis

Helget argues the district court erred in granting summary judgment to the defendants. She contends the court erred in finding her speech was not entitled to First Amendment protection as a matter of law and in granting qualified immunity to Dougherty and Scheibler.

Although Helget's challenges are mostly evidentiary in form, we have "an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Rankin v. McPherson*, 483 U.S. 378, 386 n.9 (1987) (citation omitted); *see also Lytle v. City of Haysville*, 138 F.3d 857, 862 (10th Cir. 1998). We conclude the district court did not err in granting summary judgment in favor of the defendants on Helget's First Amendment retaliation claims;

therefore, we do not reach her challenge to the district court's qualified immunity finding.

### A. *Helget's First Amendment Retaliation Claims*

Helget asserted three First Amendment claims, all singularly directed at the City's purported retaliation for her support of Dryden's federal court litigation. Specifically, she claims the City terminated her employment in retaliation for her exercising her First Amendment right to testify truthfully, to speak out on a matter of public concern, and for conspiring to violate her First Amendment rights. Because all of Helget's First Amendment claims are interrelated, we address them as one.[2]

We review the district court's grant of summary judgment de novo, applying the same legal standards the district court applied under Federal Rule of Civil Procedure 56(a). *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014). "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A public employer may not "discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of

---

[2] Helget's two speech claims are functionally equivalent, as they are both directed at her First Amendment retaliation allegations. In other words, they are part of the same overarching First Amendment retaliation claim. And her last claim, conspiracy to violate her First Amendment rights, necessarily requires Helget to first show a deprivation of her First Amendment rights.

speech." *Rankin*, 483 U.S. at 383; *see also Connick v. Myers*, 461 U.S. 138, 142 (1983). "Speech by citizens on matters of public concern lies at the heart of the First Amendment," and "public employees do not renounce their citizenship when they accept employment." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). Therefore, the Supreme Court "has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." *Id.*

Nevertheless, a public employer must be able to control the operations of its workplace. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Lytle*, 138 F.3d at 863. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Thus, "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane*, 134 S. Ct. at 2374 (quoting *Pickering*, 391 U.S. at 568).

The familiar *Garcetti/Pickering* test governs our review of Helget's First Amendment retaliation claims. The test consists of five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (quoting *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009)). The first three steps concern questions of law for the courts, and the last two concern questions of fact. *Id.*

The district court focused its inquiry on the second and third steps. The parties agreed Helget's speech was not in response to her official duties, and the court did not reach the fourth and fifth steps. Because Helget's claims can be resolved at the third step of the *Garcetti/Pickering* test, we confine our review to that step. *See Trant*, 754 F.3d at 1166.

The district court, in weighing the City's interests as an employer against Helget's interest in her speech, found the balance weighed in favor of the City. The court characterized Helget's interest as weak because, for one, Helget did not claim to know why City officials removed Dryden from the ballistic vest ordering list. Comparatively, the court reasoned the City had a strong operational interest in maintaining trust among its employees. And Helget's position as administrative secretary was "unique" because maintaining the Department's

confidences—and the trust resulting from that responsibility—was paramount to her effectively performing her duties.

When a public employee speaks as a citizen on a matter of public concern, a court next examines "whether the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Lane*, 134 S. Ct. at 2380 (quoting *Garcetti*, 547 U.S. at 418). "The only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, *by the speech itself*, of the public employer's internal operations and employment relationships.'" *Trant*, 754 F.3d at 1166 (citation omitted).

In balancing the interests, we do not consider the employee's speech in a "vacuum." *Rankin*, 483 U.S. at 388. Rather, "the manner, time, and place of the employee's expression are relevant." *Id.* Pertinent factors to consider include whether the statement: "[1] impairs discipline by superiors or harmony among co-workers, [2] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or [3] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.*

We have stated "the primary consideration is the impact of the disputed speech 'on the effective functioning of the public employer's enterprise.'" *Lytle*, 138 F.3d at 868 (quoting *Rankin*, 483 U.S. at 388). A public employer need not show that the employee's speech *in fact* disrupted internal operations and

employment relationships. *Trant*, 754 F.3d at 1166. Instead, "[i]t need[] only to establish that the speech could *potentially* become so disruptive to the [employer's] operations as to outweigh [the employee's] interest in the speech." *Id.*; *Rock v. Levinski*, 791 F.3d 1215, 1220 (10th Cir. 2015) ("The employer need not await the detrimental impact before taking action. Preemptive steps to avoid such an impact can be acceptable, and we 'will generally defer to a public employer's reasonable predictions of disruption . . . .'" (citation omitted)).

A public employer's burden to justify its restriction on speech "increases in proportion to the value of that speech in the public debate." *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998) (citation omitted); *see also Lane*, 134 S. Ct. at 2380 ("We have also cautioned, however, that 'a stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern.'" (quoting *Connick*, 461 U.S. at 152)). And where the employee is acting as a whistleblower, exposing government corruption, his or her interest is entitled to greater weight. *Lytle*, 138 F.3d at 865. When an employee refuses to take advantage of internal channels, however—*i.e.*, by airing grievances outside the department—an employee's interest may be diminished when the chosen form of speech is "unnecessarily disruptive." *Id.* at 865.

We begin our analysis with the City's interests. We have long recognized that loyalty and confidence among employees is especially important in a law

enforcement setting.  *See Worrell v. Henry*, 219 F.3d 1197, 1206 (10th Cir. 2000); *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir. 1995) (The "need [for workplace harmony] is particularly acute in the context of law enforcement, where there is a 'heightened interest . . . in maintaining discipline and harmony among employees.'" (citation omitted).  And "[t]hese concerns are even greater in a relatively small department, where a minor disturbance in morale might loom large."  *Lytle*, 138 F.3d at 867; *see also Moore*, 57 F.3d at 934.

Helget's position as administrative secretary required her to work closely with Police Chief Scheibler and Assistant Police Chief Dawson.  The position also required her to handle confidential information in administering her duties.  Indeed, the job description explicitly states "[t]his employee should possess . . . the ability to maintain confidentiality" and that one essential function is "maintain[ing] confidential records and files."  App. 4 (Memorandum and Opinion, Mar. 19, 2015, Doc. 211) (quoting personnel manual).  Thus, ensuring the protection of the Department's confidences was crucial to Helget's job performance, and any diminution in trust by Scheibler or Dawson because of her inability to maintain confidences could have affected her working relationship with her direct supervisors.

Scheibler testified that after Helget disclosed confidential information in her affidavit, he no longer trusted her.  In other words, he questioned whether he could convey confidential information to her related to departmental matters, an

-12-

essential part of her role with the Department.[3]  Scheibler's concern also necessarily implicated Helget's loyalty to the Department—namely, whether she was devoted to her supervisors and their obligation to manage the Department, or whether her allegiance was to others outside the Department.  Thus, Scheibler's testimony supports the finding that Helget's speech had a detrimental impact on her working relationship with her superiors, which required personal trust and loyalty.  *See Rankin*, 483 U.S. at 388.

The loss of trust in Helget would have also affected the regular operation of the Department and her ability to perform her duties.  *See id.*  Helget's role

---

[3]  We reject Helget's argument that the district court misapplied the summary judgment standard by wrongfully accepting Scheibler's testimony as credible.  While it is true that "[o]n summary judgment, a district court may not weigh the credibility of the witnesses," *Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008), this ordinarily means "the court may not grant summary judgment based on its own perception that one witness is more credible than another," *id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  But where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is not one of credibility, but rather the absence of evidence creating a triable issue of fact.  And in that regard, Helget "must do more than 'merely assert that the jury might' disbelieve the testimony of [Scheibler]; [s]he must present h[er] own affirmative evidence of those facts which are contradicted by the interested testimony."  *See Wood v. Handy & Harman Co.*, 318 F. App'x 602, 606–07 (10th Cir. 2008) (unpublished) (quoting *Liberty Lobby*, 477 U.S. at 256–57); *see also Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").  Here, Helget failed to offer admissible evidence contradicting Scheibler's testimony.  Even further, it seems obvious that City officials would have lost trust in Helget after she unilaterally revealed the Department's confidences to an adverse party in pending litigation against the City.

required her to "facilitate the smooth operation of the Department" and "act[] as a general information center."  Supp. App. 141.  Scheibler and Dawson relied on Helget for an array of tasks, many of which required handling confidential matters.  Like many administrative secretaries, Helget was effectively the Department's nerve center or liaison between the Department's decision makers and others in the Department.  Had Scheibler and Dawson been compelled to work with Helget after learning she revealed confidential information—notably, she was terminated six days after Scheibler learned of the affidavit—the strained relationship would have certainly interfered with the regular operation of the Department.[4]  And, if Scheibler refused to convey confidential information to Helget, it would have impeded her ability to perform the duties essential to her job.

Thus, based on the facts, the City's operational interests as a public employer are strong.

On the other side of the ledger is Helget's interest in her speech.  Helget maintains her interest is significant because her statements disclosed misconduct

---

[4]  To the extent Helget argues the district court misapplied the summary judgment standard by wrongfully presuming Helget's speech caused workplace disharmony, we reject it.  Our precedent makes clear that "actual" disruption is not required.  *Trant*, 754 F.3d at 1166 ("[T]he Board was not required to show that the speech had in fact disrupted the OCME's internal operations. . . .  It needed only to establish that the speech could *potentially* become so disruptive . . . .").  And, as we have discussed, the circumstances of Helget's speech could have (and most likely did) cause disharmony between her and her superiors.

by the City. In particular, in the context of the Dryden litigation, Helget's sworn affidavit placed into question the City's stated reason for terminating Dryden. The City claimed it terminated Dryden because of an incident occurring in late December 2010. But Helget averred that, as early as December 6, 2010, the City had decided not to order Dryden a new ballistic vest—presumably because he would not be around to wear it.

But Helget admits that at the time she signed the affidavit she did not know why Department officials removed Dryden from the ballistic vest ordering list. And a plain reading of the affidavit does not reveal any improprieties or misconduct by the City. Specific to the Dryden litigation, Helget simply attested to the fact that Dryden was generally known to be active in the local Fraternal Order of Police chapter and that she was instructed to remove Dryden from the ballistic vest ordering list in early December 2010. Thus, it cannot be said with any certainty that Helget was disclosing government misconduct.

Even further, the manner in which Helget elected to air her discourse about Dryden's termination minimizes her claimed interest in the speech. She signed an affidavit in support of a party who was adverse to the City in pending litigation. Before taking that step, Helget did not raise the issue with her superiors, let alone inform them after executing the affidavit. She had several opportunities to address the issue with Scheibler and Dawson, who, importantly, were not in command when the Dryden termination decision was made. This fact intensified

-15-

the disruptive impact of Helget's disclosure. We therefore conclude Helget's chosen form of speech was disruptive, *see Lytle*, 138 F.3d at 865, and that her interest in making the statements should be discounted accordingly.

Considering the circumstances as a whole, we agree with the district court that the City's strong interests as a public employer outweigh Helget's interest in supplying an affidavit in a former employee's litigation.

* * *

Because the balance of interests weigh in favor of the City under the *Pickering* balancing step, Helget cannot satisfy the *Garcetti/Pickering* test. Thus, the district court did not err in concluding that Helget's speech was not entitled to protection under the First Amendment. We therefore hold the district court did not err in granting summary judgment in favor of the defendants on Helget's First Amendment retaliation claims.

**B. *Qualified Immunity for Dougherty and Scheibler***

Because we conclude the district court did not err in granting summary judgment in favor of Dougherty and Scheibler on Helget's First Amendment retaliation claims, there is no constitutional violation to satisfy the first *Saucier* prong. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Thus, we need not reach Helget's additional arguments on qualified immunity.

## C. Helget's Motion for Spoliation Sanctions

Helget lastly argues the district court improperly granted summary judgment before resolving her pending motion for spoliation sanctions.

By way of background, after Helget's termination, her counsel sent a litigation-hold letter to the defendants demanding they preserve relevant electronic documents and communications. Suspecting the City had not fully complied with the discovery request, Helget asked the court to order production of documents and sanctions. The court found "potential" spoliation issues with the internet-usage and email history of certain custodians and ordered the City to have the information forensically restored.[5] Helget later filed a second motion for spoliation sanctions, but the court never acted on the motion.

While the sanctions motion was pending, all parties moved for summary judgment. In opposing the City's motion, Helget made scant reference to her outstanding motion for spoliation sanctions and how its disposition might influence summary judgment. The only reference in over 100 pages of briefing is a vague comment in the introduction of Helget's opposition to the City's motion: "[T]he documentary evidence that remains after the City's well-documented spoliation and failure to put a litigation hold in place demonstrates, at a minimum, that there are disputed issues of material fact which necessitates a trial." App.

---

[5] Relatedly, Helget filed a separate motion under Federal Rule of Civil Procedure 37, alleging discovery violations by the defendants. The court granted the motion in part, ordering the City to produce certain IT service logs.

-17-

304. Nevertheless, Helget now asserts the district court erred by failing to rule on her second motion for spoliation sanctions before disposing of her claims on summary judgment.

We generally review a district court's ruling on a motion for spoliation sanctions for an abuse of discretion. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1103, 1032 (10th Cir. 2007). District courts have "substantial weaponry" in their arsenal to shape the appropriate relief for a party's spoliation of evidence.[6] *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *see also Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) ("[A] district court has broad discretion in choosing an appropriate sanction for spoliation, 'the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.'" (citation omitted)). Among the options, a court may strike witnesses, *103 Inv'rs I, L.P. v. Square D Co.*, 470 F.3d 985, 988 (10th Cir. 2006); issue an

---

[6] Federal courts possess the inherent powers necessary "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases," including imposing appropriate sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 44 (1991). Although this circuit has not directly spoken to the issue, other circuits have held that sanctions for the spoliation of evidence is a matter of federal law. *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc) (listing the Second, Fourth, Fifth, and Ninth Circuits); *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *see also* 22 Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5178.3 (2d ed. & Apr. 2016 Update). *But see Rowe v. Albertsons, Inc.*, 116 F. App'x 171 (10th Cir. 2004) (unpublished) (applying Texas state law to spoliation sanctions issue). This particular issue is not dispositive here.

adverse inference, *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1219–20 (10th Cir. 2008) ; exclude evidence, *see Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998) (unpublished); or, in extreme circumstances, dismiss a party's claims, *id.*[7]

But, here, Helget forfeited her right to seek refuge in her undecided motion for spoliation sanctions by failing to raise the argument in any meaningful way in opposing summary judgment. Although not directly on point, the precepts of Federal Rule of Civil Procedure 56(d) are instructive. Rule 56(d) allows a nonmovant to show by affidavit or declaration that, for a specified reason, it cannot present facts essential to justify opposition to a motion for summary judgment. That is, it provides a means for a nonmovant to "ask the court to refrain from acting on the summary judgment request until additional discovery can be conducted." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1235 (10th Cir. 2007). Thus, Rule 56(d) serves a noticing function that "safeguards against an improvident or premature grant of summary judgment." *See* 10B Charles Alan Wright, Arthur R. Miller et al., *Federal Practice & Procedure* § 2740 (3d ed. &

---

[7] The 2015 revisions to Federal Rule of Civil Procedure 37(e) provide courts further guidance on issuing sanctions for destroying or failing to preserve electronically stored information (ESI). The Rule instructs courts to "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). But where a party acts with the intent to deprive another from using the ESI in litigation, a court may "presume that the lost information is unfavorable to the party," issue an adverse-inference instruction, or "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2)(A)–(C).

Sept. 2016 Update) (footnote omitted).  A nonmovant failing to raise the evidentiary impediments preventing it from meeting its summary judgment burden acts at its own peril.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

Helget balks at the relevancy of Rule 56(d) because additional discovery or an extension of time would have been futile.  But the purpose of Rule 56(d) is broader than simply postponing a ruling while the parties conduct additional discovery.  It also serves a noticing function by alerting the court that a summary judgment ruling might be premature.  And the Federal Rules and our precedents discussed above place added emphasis on a nonmovant's duty to inform the court when it cannot present facts sufficient to meet its summary judgment burden.  Although we stop short of holding Helget had a duty to file a Rule 56(d) affidavit to preserve the issue, she did have *some* obligation to alert the district court that her pending spoliation motion could affect the summary judgment motions.  In over 100 pages of briefing on summary judgment, Helget made a single, passing reference to spoliation.  We cannot agree that this vague reference is sufficient to allow Helget to collaterally attack the district court's order on summary judgment by pointing to the court's failure to first rule on her spoliation sanctions motion.[8]

---

[8]  And because Helget "hasn't even attempted to show how [her] new legal theory satisfies the plain error standard," it "marks the end of the road for an argument for reversal not first presented to the district court."  *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131–32 (10th Cir. 2011).

We acknowledge that as a matter of best practices, the district court should have ruled on the motion before, or in the process of, deciding summary judgment. But without guidance from the party seeking sanctions on how spoliation could affect pending summary judgment issues, it is difficult to see how the district court abused its discretion in proceeding the way it did.[9]

We therefore reject Helget's argument that the district court committed reversible error by not ruling on her motion for spoliation sanctions before disposing of her claims on summary judgment.

## III. Conclusion

In sum, Helget cannot point to any error in the district court's order granting summary judgment in favor of the defendants on her First Amendment retaliation claims. We therefore AFFIRM.[10]

---

[9] We also reject Helget's attempt to conform her requested sanctions to the current posture of the case. Helget argues that where an opposing party intentionally destroys evidence without justification, "that 'destruction of evidence' . . . 'is adequate to defeat summary judgment.'" Aplt. Br. at 27 (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001)); *see also* Reply at 9–10. Helget has failed to cite, and our own research has not revealed, any case from this circuit supporting such proposition. But more detrimentally, she raises this form of sanction for the first time on appeal.

[10] We also DENY the defendants' request to dismiss Helget's appeal for filing an untimely opening brief. Aple. Br. at 3. Helget filed her brief within ten days of the letter order dated October 20, 2015, as instructed.

*Helget v. City of Hays* 15-3093

**TYMKOVICH**, Chief Judge, concurring.

I write separately because I would reject an additional argument raised by Helget: that her voluntary affidavit in the Dryden litigation is per se a matter of public concern under the *Garcetti*/*Pickering* test because of its form and context. The district court thoroughly examined whether Helget's speech was on a matter of public concern, but ultimately assumed, without deciding, the step was satisfied. The court did, however, reject Helget's argument that her speech was per se a matter of public concern because it took the form and context of a sworn affidavit. But Helget maintains that her affidavit in the Dryden litigation automatically satisfies the public concern requirement as a matter of law.

Speech involves a matter of public concern when it relates to matters of "'political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Lane*, 134 S. Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). The court's inquiry considers the "content, form, and context" of the given statements. *Id*.

The "crux of the public concern content inquiry" is "what is actually said on the topic." *Wren v. Spurlock*, 798 F.2d 1313, 1317 n.1 (10th Cir. 1986). Statements revealing government misconduct or impropriety generally involve matters of public concern. *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007). But "speech relating to internal personnel

disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *Morris v. City of Colorado Springs*, 666 F.3d 654, 661 (10th Cir. 2012) (alteration omitted) (citation omitted). In other words, "speech that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern." *Brammer–Hoelter*, 492 F.3d at 1205 (quoting *Connick*, 461 U.S. at 147–48).

As to form and context, the Supreme Court recently held that sworn testimony in a judicial proceeding "fortifies" a matter-of-public-concern finding. *Lane*, 134 S. Ct. at 2380. The speech at issue in *Lane* was the petitioner's testimony under subpoena at the trial of a public official for corruption and misuse of state funds. *Id*. at 2375. The Court observed, "Unlike speech in other contexts, testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *Id*. (quoting *United States v. Alvarez*, 132 S. Ct. 2537, 2546 (2012) (plurality opinion)). But the Court stopped short of declaring that sworn testimony in a judicial proceeding is per se a matter of public concern.

Circuit courts are unsettled on whether trial testimony is per se a matter of public concern. This court surveyed the legal landscape in a recent case, but refused to enter the fray, observing:

There is a debate on whether trial testimony is per se a matter of public concern. . . . Some [circuits] hold that any trial testimony is a matter of public concern. *See, e.g.*, *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir. 1989) ("When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern."); *Latessa v. N.J. Racing Comm'n*, 113 F.3d 1313, 1319 (3d Cir. 1997) (same). Some have not gone so far. *See, e.g.*, *Wright v. Ill. Dept. of Children & Family Servs.*, 40 F.3d 1492, 1505 (7th Cir. 1994); *Padilla v. S. Harrison R–II Sch. Dist.*, 181 F.3d 992, 996–97 (8th Cir. 1999). We do not enter the debate . . . .

*Deutsch v. Jordan*, 618 F.3d 1093, 1099 n.1 (10th Cir. 2010). Circuits advancing a per se rule point out that all citizens owe an independent duty to society to testify truthfully in court proceedings, which may be impeded if an employee fears retaliation and reprisal by a public employer as a result of his or her testimony. *Reilly v. City of Atlantic City*, 532 F.3d 216, 229 (3d Cir. 2008); *see also Catletti ex rel. Estate of Catletti v. Rampe*, 334 F.3d 225, 229–30 (2d Cir. 2003) ("In this case the context of Catletti's speech—testimony offered at trial—is significant. . . . The paramount importance of judicial truth-seeking means that truthful trial testimony is almost always of public concern.").[1]

---

[1] In *Worrell v. Henry*, the court agreed generally "that truthful testimony is protected by the First Amendment and that a government employee may not be fired or subjected to other adverse action as a result of such testimony." 219 F.3d 1197, 1204–05 (10th Cir. 2000) (collecting cases from other circuits). But in *Worrell*, the parties agreed the testimony at issue was on a matter of public concern. *Id.* at 1206. Thus, the court did not address whether the form and context of the testimony, standing alone, compelled a finding that the plaintiff's

(continued...)

Moreover, in the context of a civil case, the justification offered by the per-se-rule circuits is of greater weight when the testimony is compelled by a valid subpoena. *See Herts v. Smith*, 345 F.3d 581, 586 (8th Cir. 2003) ("Subpoenaed testimony on a matter of public concern in ongoing litigation . . . can hardly be characterized as defeating the interests of the state in efficient public service through its employees."); *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1070 (9th Cir. 2012) (discussing subpoenaed trial testimony and subpoenaed deposition testimony). *But see Reilly*, 532 F.3d at 230 ("We concluded that 'there is a compelling reason to find Green's appearance to be a matter of public concern *regardless of its voluntary nature*.'" (emphasis added) (quoting *Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 887 (3d Cir. 1997))).

But Helget's speech here differs in two material ways. First, her speech is in the form of an affidavit, rather than trial testimony. Although her statements are in writing and sworn to under oath, this form of speech is one step removed from the adversarial, truth-seeking process that ensures a certain level of reliability. Second, her speech was completely voluntary. In other words, this is not an instance in which Helget had been subpoenaed to testify and, as a result, subjected to a Catch-22 situation—either testify truthfully consistent with her duty to the court and society, or risk retaliation and reprisal by the City. *See*

---

[1](...continued)
speech was a matter of public concern.

*Johnston*, 869 F.2d at 1578 ("If employers were free to retaliate against employees who provide truthful, but damaging, testimony about their employers, they would force the employees to make a difficult choice. Employees either could testify truthfully and lose their jobs or could lie to the tribunal and protect their job security."). Thus, even if the court were to recognize a per se rule as to the form and context of given speech, which this court and the Supreme Court have not done, Helget's voluntary sworn affidavit is not of the form and context that would necessarily compel per se protection.

Importantly, this conclusion would not foreclose a finding that Helget's speech is on a matter of public concern because of its *content*. Consistent with our precedent, "Statements revealing official impropriety usually involve matters of public concern." *Brammer–Hoelter*, 492 F.3d at 1205. Thus, if Helget's speech reveals impropriety or misconduct by the City, the fact that her statements were incorporated into a voluntary sworn affidavit does not discount the inevitable finding that her speech is on a matter of public concern.[2] So in that

---

[2] The Ninth Circuit has taken this a step further. In *Alpha Energy Savers, Inc. v. Hansen*, the court refused to adopt a per se rule, but held that either the *content* or *context* of an employee's testimony in a judicial proceeding could satisfy the matter-of-public-concern inquiry. 381 F.3d 917, 926–27 (9th Cir. 2004). Because judicial proceedings that expose "potential or actual discrimination, corruption, or other wrongful conduct by [the] government" are inherently matters of public concern, an employee's testimony is a matter of public concern when it is about "corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees." *Id*. at 925–26. Such position would be unnecessary here because our precedents concerning the

(continued...)

regard, my view is a narrow one—namely, that speech contained in a voluntary

sworn affidavit in a civil case is *not automatically* a matter of public concern.  It

depends on content, form, and context of the speech.

---

content of given speech sufficiently account for this type of speech.